IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BOBBY GUTIERREZ,
*in his capacity as Wrongful Death Personal Representative
of the Estate of Robert P. Gutierrez,*

      Plaintiff,

      vs.                                            Case No. 1:21-cv-00073-KWR-SCY

UNI TRANS, LLC, UNITRANS, LLC,
CEVA LOGISITCS US, INC.,
CEVA GROUND US, LLP,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Defendant CEVA Logistics U.S., Inc.'s Motion for Summary Judgment. Doc. 236. Having reviewed the pleadings and the relevant law, the Court finds that the motion is well taken, and therefore, is **GRANTED**.

## BACKGROUND

This diversity case is a personal injury action resulting from a tragic traffic collision in New Mexico. Plaintiff Bobby Gutierrez, in his capacity as Wrongful Death Personal Representative of the Estate of Mr. Gutierrez, alleges the following claims: Negligence and Negligence *per se* against Saydiev[1] and vicarious liability of Defendant Uni Trans, LLC ("Uni Trans") (Count I), and Negligence, Negligence *per se*, and Joint and Several Liability against all Defendants (Count II). Doc. 80. Defendant CEVA Logistics US, Inc. ("CEVA") seeks the instant motion for summary judgment.

---

[1] Plaintiff's claims against Saydiev were dismissed without prejudice for failure to serve him. *See* **Doc. 78**.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could have an effect on the outcome of the suit. *See Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its initial burden, the non-movant cannot "rest on the pleadings[,] but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." *See Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and the moving party will be entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

On summary judgment, the Court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). The Court cannot weigh the evidence and determine the truth of the matter, but instead, must determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## UNDISPUTED MATERIAL FACTS[2]

The Court may consider only admissible evidence when ruling on a summary judgment motion. *See Johnson v. Weld County*, 594 F.3d 1202, 1209 (10th Cir. 2010); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Although "the form of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial, the content or substance of the evidence must be admissible." *Johnson*, 594 F.3d at 1210 (internal quotations and emphasis omitted).

Additionally, the Court may disregard a party's version of the facts which are clearly unsupported by the record. "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations and alteration omitted) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### **CEVA and Uni Trans**

CEVA is a logistic company in North America and provides trucking transportation services, freight forwarding, contract logistics, warehousing, customs house brokerage and ground delivery. Undisputed Material Facts ("UMF") ¶¶ 15-16. CEVA Ground US, LP is certified as a motor carrier. Doc. 257-9 at 16-19.

---

[2] The Court has determined the relevant facts based on the parties' submissions, while omitting extraneous detail, party arguments, and facts not supported by the record.

On or about March 27, 2018, CEVA and Uni Trans agreed to a Carrier Terms and Conditions Agreement ("Carrier Agreement"). Doc. 236-2. The Carrier Agreement stated that CEVA is "a licensed property broker by the Federal Motor Carrier Safety Administration ("FMCSA"), and as a licensed broker, arranges for freight transportation." *Id*. at 1. The Carrier Agreement stated that Uni Trans is a carrier and "an independent contractor . . . as such, is wholly responsible in every way for such persons as Carrier hires or employs in the performance of any of the services covered under these Terms and Conditions." *Id.* at 1-3. The Carrier Agreement is missing Section 3 and Section 14 as referenced in paragraph D. No Double Brokering and Sections 4 and Section 7 as referenced in paragraph O. Waiver of Consequential Damages.[3] *Id.* at 2-3. Uni Trans became an authorized carrier for CEVA on or about March 29, 2015. Doc. 236-1 at 3.

CEVA sent a letter to Uni Trans and addressed Uni Trans as a "Carrier Partner." Doc. 257-1. The letter addressed the goals for their businesses to mutually grow and discussed the advantages of partnering with CEVA. *Id.*

**CEVA Carrier Approval Process**

Carriers submit their Carrier Information Profile, which includes name of the carrier, contact information, type of equipment, number of drivers, endorsements, and motor carrier ("MC") number. Doc. 257-9. A CEVA employee will verify the information using the MC number and public information to determine it is accurate and determine the carrier's safety score. Doc. 266-1 at 10-11. Carriers must then sign the Carrier Agreement, which requires the carrier to represent and warrant that it is authorized as a motor carrier by all relevant federal and

---

[3] Plaintiff argues the Carrier Agreement is not the entirety of the agreement because Defendant has failed to provide the sections referenced. Doc. 257 at 6. Paragraph D and Paragraph O in the Carrier Agreement are not at issue in this case because the Court is not addressing double brokering or waiver of consequential damages.

state law and "does not have an unsatisfactory safety rating issued from the U.S. Department of Transportation." Doc. 236-2. The Carrier Agreement requires the carrier to "immediately notify Broker after receiving, or upon the occurrence that has a likelihood of Carrier receiving, an unsatisfactory safety rating issued from the U.S. Department of Transportation. . ." *Id.* An automated system at CEVA monitors the carrier's MC number and safety score. Doc. 266-1 at 21. If the carrier falls out of compliance with the Carrier Agreement, such as lapse on insurance or unsatisfactory safety rating, the automated system blocks the carrier from receiving dispatches for transportation. Doc. 266-1 at 21.

### The Subject Shipment and Accident

On March 27, 2020, Uni Trans agreed to transport goods from San Diego, California to Groveport, Ohio. Doc. 257-9. The load was picked up from a CEVA Warehouse. Doc. 257-4 at 1-5. On or about March 28, 2020, Otabek Saydiev, a Uni Trans driver, was driving a semi-tractor and trailer on eastbound I-40 in New Mexico, at or near Milepost 73. UMF ¶¶ 1, 35. Decedent, Robert P. Gutierrez, was stopped in traffic on eastbound I-40 near Milepost 73. UMF ¶ 2. Mr. Saydiev fell asleep while operating the semi-tractor and collided with the stopped vehicles. UMF ¶ 4.

The Load and Rate Confirmation list Uni Trans as the Carrier. Doc. 257-9 at 10-11. The Bill of Lading signed on March 30, 2020, list CEVA as the carrier, the shipper, and the consignee. Doc. 257-3. CEVA was not the owner of the tractor or trailer utilized in the shipment. Doc. 236-1 ¶ 32; Doc. 266-1. Mr. Saydiev met the minimum requirements for safe driving, had no FMCSA reportable crashes, and had 5-6 years driving experience. Doc. 266-3; Doc. 266-4; Doc. 266-5.

## DISCUSSION

CEVA argues that summary judgment is appropriate because CEVA is not vicariously liable or negligent for retention and selection of a carrier. Doc. 236 at 1. Plaintiff argues that summary judgment is not appropriate because there are factual disputes related to whether CEVA was a partner to Uni Trans, whether CEVA was a motor carrier, whether CEVA had operational control over Uni Trans, and whether CEVA had a carrier approval process for Uni Trans. Doc. 257 at 1. The Court finds there are no genuine issues of material facts. The Court also finds that CEVA is not vicariously liable or negligent for retention and selection of a carrier.

**I.     CEVA was not a partner with Uni Trans.**

CEVA argues it is not liable because it did not form a partnership with Uni Trans. Doc. 236 at 7. Plaintiff argues that CEVA and Uni Trans were partners. Doc. 257 at 11. The Court is not convinced that CEVA and Uni Trans formed a partnership.

Partnership formation is based on state law where the partnership is domiciled or the jurisdiction in which the partnership has its chief executive office. CEVA is incorporated in Delaware and Uni Trans has its chief executive office in Ohio and Florida. Doc. 89 ¶ 4; Del. Code Ann. tit. 6, § 15-106 ("[T]he law of the jurisdiction governing a partnership agreement governs relations among the partners and between the partners and the partnership); *Total Holdings USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873 (2009) (holding that the general partnership was domiciled in Delaware and Delaware law applied); *see also* Fla. Stat. Ann. § 620.8106 (the law of the jurisdiction in which a partnership has its chief executive office governs relations among partners and between the partners and a partnership); Ohio Rev. Code Ann. § 1776.06 ("[T]he law of the jurisdiction in which a partnership has its chief executive office

governs relations among the partners and between the partners and the partnership). Therefore, the Court will determine the formation of partnership under Delaware, Florida, and Ohio law.

A partnership is formed when the association of two or more persons co-own a business for profit, whether or not the person intended to form a partnership. Del. Code Ann. tit. 6, § 15-202; Fla. Stat. Ann. § 620.8202; Ohio Rev. Code Ann. § 1776.22. To support their argument, Plaintiff relies on a CEVA letter to Uni Trans. The letter addresses Uni Trans as "Carrier Partner" and states "We select partners based upon quality of services . . . We rely heavily upon our partners . . . Several advantages of partnering with CEVA are . . .We look forward to partnering with you . . ." Doc. 257-1. While the letter refers to Uni Trans as a partner, it does not establish the formation of a partnership. CEVA and Uni Trans do not co-own a business for profit. The Carrier Agreement defined the relationship between CEVA and Uni Trans as a broker and carrier relationship, not co-ownership of a business for profit. Doc. 236-2. Zerius Brittain, the Director of Ground Procurement, Head for CEVA, also stated in his affidavit that CEVA at no time entered into any formal partnership agreement with Uni Trans. Doc. 236-1 ¶ 23. The Court recognizes that CEVA described Uni Trans as a partner in a letter, but as Mr. Brittain further stated, CEVA "considers all of its business customers as informal or colloquial business partners in the shipping and logistics of goods around the world." *Id.* at ¶ 24. The colloquial use of the word "partner" does not establish a partnership because there was no co-ownership of a business for profit. Because there is no evidence that CEVA and Uni Trans co-owned a business for profit, the Court finds that CEVA and Uni Trans did not form a partnership.

**II.     CEVA is not vicariously liable pursuant to a principal agent relationship.**

CEVA argues it is not vicariously liable because CEVA did not retain operational control of Uni Trans or Mr. Saydiev. Doc. 236 at 9. Plaintiff argues that CEVA maintained operational

7

control over the subject shipment. Doc. 257 at 11. The Court finds that there is no vicarious liability pursuant to principal agent relationship because Uni Trans was an independent contractor and CEVA did not have operational control over Uni Trans.

"New Mexico courts have employed an agency analysis to determine whether an individual is acting as an independent contractor or as an employee." *Celaya v. Hall*, 2004-NMSC-005, ¶ 11, 135 N.M. 115. In New Mexico, a "right to control analysis focuses on whether the principal exercised sufficient control over the agent to hold the principal liable for the acts of the agent," and where a sufficient right to control is present, "an employer-employee relationship usually exists." *Id.* ¶ 12. "The principal test is whether the employer has the right to control the manner in which the details of the work are to be accomplished, not the exercise of any control at all." *Scott v. Murphy*, 1968-NMSC-185, ¶ 10, 79 N.M. 697. When the right to control is not fundamentally a part of the relationship, a court may consider a number of factors when determining whether an individual is acting as an employee or independent contractor: (1) the degree of control the principal exercises over the details of the agent's work, (2) the type of occupation and whether it is usually performed without supervision; (3) the skill required for the job; (4) whether the employer supplies the instrumentalities or tools for the person doing the work; (5) the length of time the person is employed; (6) the method of payment, whether by time or job; (7) whether the work is part of the regular business of the employer; (8) whether the parties intended to create an employment relationship; and (9) whether the principal is engaged in business. *See Loya v. Gutierrez,* 2015-NMSC-017, ¶¶ 55-56, 350 P.3d 1155; Celaya, 2004-NMSC-005, ¶ 15 (citing Restatement (Second) of Agency § 220(2)(a-j)).

The Carrier Agreement sets out that Uni Trans "is an independent contractor, and, as such, is wholly responsible in every way for such persons as Carrier hires or employs in the

performance of any of the services covered under these Terms and Conditions." Doc. 236 at 2. The Carrier Agreement makes clear that Uni Trans has "the sole and exclusive responsibility for the manner in which its employees and/or independent contractors perform the transportation services, including the equipment provided." *Id.* at 3. Therefore, neither CEVA and Uni Trans intended to create an employment relationship, and CEVA did not have sufficient operational control over Uni Trans. Mr. Saydiev was not an employee of CEVA, and Uni Trans owned the tractor and trailer in the subject shipment. Doc. 266-2; Doc. 266-5. The method of payment was also based on the job, not time. Doc. 257-9 at 10. Therefore, the Court finds that there is not an employer-employee relationship between CEVA and Uni Trans or CEVA and Mr. Saydiev.

Plaintiff argues that the letter CEVA sent to Uni Trans established that CEVA had operational control over Uni Trans. Doc. 257 at 11. The letter expressed goals and "ask[ed] [Uni Trans] to collaborate with [CEVA] by: committing to service/capacity/providing complete and accurate load status information and immediate notification of changes which may impact services, [and] submitting BOLs/PODs as quickly as possible following delivery." Doc. 257-1 at 1. The letter expresses a *request*, not an obligation, to Uni Trans and does not establish operational control. The Carrier Agreement sets Uni Trans' obligations, which states that Uni Trans "shall transport shipments without delay and will comply with all agreed upon pick-up and delivery schedules. Carrier shall immediately notify Broker of any likelihood of delay." Doc. 236-2 at 1. After reviewing the record, the Court finds that no reasonable jury could find that CEVA had operational control on how Uni Trans transported the subject shipment.

The Court finds that there is not an employer-employee relationship between CEVA and Uni Trans or CEVA and Mr. Saydiev, and thus, CEVA is not vicariously liable pursuant to a principal agent relationship.

**III.   CEVA is not vicariously liable pursuant to the statutory employee doctrine.**

CEVA argues that it was a freight broker on the subject shipment and cannot be held vicariously liable for the accident. Doc. 236 at 7. Plaintiff argues that there is a genuine factual dispute because facts in the record suggest that Defendant was a motor carrier on the subject shipment. Doc. 257 at 11. The Court finds there is no genuine factual dispute that CEVA was a freight broker on the subject shipment, and thus, CEVA is not vicariously liable.

Under the doctrine of *respondeat superior*, an employer is vicariously liable when its employee commits negligence while acting within the course and scope of his or her employment. *Ocana v. Am. Furniture Co.,* 2004-NMSC-018, ¶ 29, 135 N.M. 539, 91 P.3d 58; *Los Ranchitos v. Tierra Grande, Inc.*, 1993-NMCA-107, ¶ 13, 116 N.M. 222, 226, 861 P.2d 263, 267 (citing *McCauley v. Ray*, 1968-NMSC-194, ¶ 28, 80 N.M. 171, 180, 453 P.2d 192). "As a general rule, an employer of an independent contractor is not responsible for the negligence of the contractor or [its] employees." *Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 393, 827 P.2d 102, 108 (1992). "One exception to the independent contractor general rule is when the independent contractor has a non-delegable duty to protect another from harm based on a duty imposed by statute." *See Dixon v. Stone Truck Line, Inc.,* No. 219CV000945JCHGJF, 2020 WL 7079047, at *9 (D.N.M. Dec. 3, 2020); *see also Harris v. FedEx Nat. LTL, Inc.*, 760 F.3d 780, 783-84 (8th Cir. 2014) (citing Nebraska law); *Saiz*, 113 N.M. at 393 ("The general rule has no application where the employer has nondelegable duties (1) arising out of some relation toward the public or the particular plaintiff (e.g., duty of lessor to lessee), or (2) because of work that is specially, peculiarly, or inherently dangerous.").

The FMCSR create a statutory employee relationship between owner-lessors and authorized motor carrier-lessees. Motor carriers are required to "have exclusive possession,

10

control, and use of the equipment. . . and shall assume complete responsibility for the operation of the equipment . . ." 49 C.F.R. § 376.12; *see also* 49 U.S.C.A. § 14102 ("The Secretary may require a motor carrier . . . that uses motor vehicles not owned by it to transport property under an arrangement with another party to . . . have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operation and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier."). An employee under the FMCSR is "any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. . . . *including an independent contractor while in the course of operating a commercial motor vehicle*." 49 C.F.R. § 390.5 (emphasis added). Further, "employer" is defined as "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it...." *Id.* Thus, an "interstate carrier is vicariously liable as a matter of law under the FMCSR for the negligence of its statutory employee drivers." *Dixon,* No. 219CV000945JCHGJF, at *9 (quoting Morris v. JTM Materials, Inc., 78 S.W.3d 28, 38 & n.5 (Tex. Ct. App. 2002)).

      Here, the issue is whether CEVA was a motor carrier and statutory employer of Mr. Saydiev. A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). A "broker" is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). According to 49 C.F.R. § 371.2, a broker is "a person who, for compensation,

11

arranges, or offers to arrange, the transportation of property by an authorized motor carrier." 49 C.F.R. § 371.2. To be a motor carrier, rather than a broker, on a certain transaction, the entity must have "arrange[d] or offer to arrange[d] the transportation of shipments which they are authorized to transport *and which they have accepted and legally bound themselves to transport*." 49 C.F.R. § 371.2 (emphasis added); *Tryg Ins. v. C.H. Robinson Worldwide, Inc.,* 767 F. App'x 284, 287 (3d Cir. 2019). "If an entity accepts responsibility for ensuring the delivery of goods, then that entity qualifies as a carrier regardless of whether it conducted the physical transportation." *Id.*

The key question is whether the entity accepted legal responsibility to transport the shipment. *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1301 (11th Cir. 2018). If a party makes it clear in writing that it is merely acting as a go-between to connect the shipper with a third-party carrier, it will be considered a broker, but when no writing exists, "the question will depend on how the party held itself out to the world, the nature of the party's communications and prior dealings with the shipper, and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question." *Id.* at 1302; *see also Vanguard Graphics LLC v. Total Press Sales & Serv., LLC,* No. 3:18-CV-55 (NAM/ML), 2020 WL 6059872, at *4 (N.D.N.Y. Oct. 13, 2020); *Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc.,* 373 F. Supp. 2d 1349, 1352 (S.D. Fla. 2005) ("Whether a company is a broker or a carrier is not determined by what the company labels itself, but by how it represents itself to the world and its relationship to the shipper"). "Because the analysis of whether defendant is a carrier or a broker is fact specific, it may not be appropriate for summary judgment." *Louis M. Marson Jr., Inc. v. Alliance Shippers, Inc.*, 438 F. Supp. 3d 326, 332 (E.D. Pa. 2020) (citing *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1302 (11th Cir. 2018) ("This is

12

necessarily a case-specific analysis, and as a result, summary judgment might not be appropriate in many cases.")).

Defendant established that CEVA was a freight broker during this transaction. The Carrier Agreement between CEVA and Uni Trans designates CEVA as the broker and Uni Trans as the carrier. Doc. 236-2 at 1. The Carrier Agreement states that CEVA is "a licensed property broker by the [FMCSA], and as a licensed broker, arranges for freight transportation." *Id.* The Carrier Agreement further states that "[i]n order to satisfy some of its customer's or shipper's (herein a "Shipper") transportation needs, Broker desires to utilize the services of Carrier to transport of some of the Shipper's freight." *Id.* It is "clear in writing that [CEVA] is merely acting as a go-between to connect the shipper with a suitable third-party carrier." *See Essex*, 885 F.3d at 1302. Additionally, Mr. Brittan testified in his deposition that CEVA was "the broker for this shipment." Doc. 257-8 at 14. Furthermore, Uni Trans part-owner, Mr. Gaybullaev testified in his deposition that the business relationship between Uni Trans and CEVA logistics was "[j]ust like normal with any other brokers." Doc. 236-3 at 3.

Plaintiff has not met their burden to dispute that CEVA was a freight broker during the instant transaction. Plaintiff argues that there are facts to show that CEVA was the carrier in this transaction. Plaintiff points to the Bill of Lading that list CEVA as the carrier. Doc. 257-3 at 1. However, the Carrier Agreement between CEVA and Uni Trans states, "Documents for each Shipment shall name [CEVA] as third party payor of all freight charges and [Uni Trans] as the carrier of record. If there is a wrongly worded document, the parties will treat it as if it showed [CEVA] as "third party payor" and [Uni Trans] as "carrier".*"* Doc. 236-2 at 1. The Court agrees there is a conflict between the Bill of Lading and the Carrier Agreement, but the Carrier Agreement addresses if conflicts arise between the agreement and shipping documents. It states,

13

"If there is a conflict between these Terms and Conditions and any transportation document related to shipment, these Terms and Conditions shall govern." *Id.* Therefore, the Carrier Agreement that establishes CEVA as freight broker is correct.

Plaintiff also argues that Defendant CEVA holds itself out as a "Leading End-to-End Logistics Company" and boasts it delivers "a complete spectrum of supply chain services" and that the pickup location was at CEVA warehouse. Doc. 257-6 at 1. CEVA Ground US, LP is also certified as a motor carrier. Doc. 257-9 at 16-19. However, the issue is not whether CEVA performed as a carrier for other shipments but rather whether CEVA was a carrier for this subject shipment. Courts must "look to how the party acted during the '*specific transaction' at issue*, which includes 'the understanding among the parties involved [and] consideration of how the entity held itself out.' " *Louis M. Marson Jr.*, 438 F. Supp. 3d at 331 (emphasis added). The Carrier Agreement and both CEVA employees and Uni Trans owner referring to CEVA as the broker establish that CEVA was the freight broker on the subject shipment. Furthermore, CEVA was not the owner of the tractor trailer on this subject shipment, and Uni Trans was listed as the Carrier on the Load and Rate Confirmation for this subject shipment. Doc. 236-1 ¶ 26; Doc. 266-2. Doc. 257-9. The Court finds that no reasonable jury could conclude that CEVA was the carrier on this subject shipment. Therefore, there is not a genuine dispute that CEVA was a freight broker on this subject shipment.

Because CEVA was a freight broker, Mr. Saydiev was not CEVA's statutory employee. Therefore, CEVA is not vicariously liable pursuant to the statutory employee doctrine.

**IV.     CEVA is not negligent for retention or selection of carrier.**

Plaintiff argues that there is a genuine factual dispute as to how CEVA vetted Uni Trans as an approved carrier, and thus, a jury could conclude that CEVA failed to meet their duty to

use reasonable care it its selection. Doc. 257 at 13-14. The Court finds that there is no genuine factual dispute that CEVA had a process for verifying their approved carriers. The Court also finds that CEVA is not negligent for retention or selection of the carrier.

"An employer is liable for physical harm to third persons caused by its failure to use reasonable care to select a competent and careful contractor (a) to perform work that will involve a risk of physical harm unless it is skillfully and carefully done or (b) to perform any duty that the employer owes to third persons." *Talbott v. Roswell Hospital Corp.*, 2008-NMCA-114 ¶¶ 10-12, 144 N.M. 753 (quoting and adopting Restatement (Second) of Torts § 411). To succeed on a negligent hiring claim, the plaintiff must show that "the employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit." *Valdez v. Warner*, 1987-NMCA-076, ¶ 11, 106 N.M. 305 (internal citation omitted). The harm the plaintiff suffered must have arisen out of the particular quality of the independent contractor which made it negligent for the employer to select that contractor to perform the work. *See Jones v. C.H. Robinson Worldwide, Inc.*, 558 F.Supp.2d 630, 643 (W.D. Va. 2008) (citing Restatement (Second) of Torts § 411 comment (b)).

"Numerous courts have recognized a claim for negligent hiring of an independent contractor in the context of the selection of a motor carrier by a broker or shipper." *Dixon,* No. 219CV000945JCHGJF, at *8; *See* also *Jones*, 558 F.Supp.2d at 641-42 (and cases cited therein, *L.B. Foster Co. v. Hurnblad*, 418 F.2d 727, 729 (9th Cir. 1969); *Hudgens v. Cook Indus., Inc.*, 521 P.2d 813, 816 (Okl. 1973); *Puckrein v. ATI Transport, Inc.*, 186 N.J. 563, 575 (N.J. 2006)). "A company whose core purpose is the transportation of goods on the highways has a duty to use reasonable care in the hiring of an independent trucker." *Id*. (quoting *Puckrein*, 186 N.J. at 579).

"A fact finder may reasonably infer that a carrier or broker would be incompetent based on a lack of experience, poor financial condition, failure to respect federal certificate requirements, and willingness to do business at cut rates." *Id.* (quoting *Hurnblad*, 418 F.2d at 729-730.

Plaintiff argues that CEVA lacked information as to how Defendant Uni Trans was vetted as an approved carrier. Doc. 257 at 3. The Court has reviewed the record and finds that no reasonable jury could conclude that CEVA did not have a process for vetting approved carriers. Mr. Brittain described how CEVA vetted approved carriers. Mr. Jeff Nichols would "check to make sure that all of the information that's presented here is accurate, their MC number checks out as stating who they are, which all of that is public information. Their [SCAC][4] codes and everything. So the due diligence just to ensure that they are who they say they are." Doc. 266-1 at 10-11. Mr. Nichols "refers to carrier's information, such as MC number, address, phone number, all the public information that is available, [SCAC] code, safety scores, and all of that to ensure that this carrier is who they say they are and this information is accurate." *Id.* To ensure compliance, an automated system monitors the carrier's [SCAC] and MC numbers, and "[i]f the carrier's safety scores go down, they – they're blocked out of the system, you can't dispatch them. If they lapse on insurance, blocked out system, you can't dispatch them." *Id*. at 21. A carrier falls out of compliance "by violating the carrier terms." *Id.*

In addition to having a process for verifying approved carriers, Uni Trans also warranted "that it is authorized as a motor carrier by all relevant federal, state and/or provincial authorities in order to lawfully perform all services undertaken pursuant to this Agreement, including but not limited to registration with the US Department of Transportation pursuant to 49 U.S.C.

---

[4] The deposition spells this "SCAT". The National Motor Freight Traffic Association Inc has a Standard Carrier Alpha Code ("SCAC"). Doc. 257-9. Mr. Brittain explained the "SCAT" Code "are safety and compliance codes that are required for every carrier, every motor carrier." Doc. 266-1 at 11.

16

13902 and 13905" and "that it does not have an unsatisfactory safety rating issued from the US Department of Transportation." Doc. 236-2. Mr. Saydiev also met the minimum requirements for safe driving in his annual review, had no FMCSA reportable crashes, and was a tractor and trailer driver for 5-6 years. Doc. 266-4; Doc. 266-5. The Court finds that CEVA is not negligent for retention and selection of a motor carrier because CEVA did not know or should have known that Uni Trans or Uni Trans' employees were unfit.

**IT IS THEREFORE ORDERED** that Defendant CEVA Logistics US, Inc.'s Motion for Summary Judgment (Doc. 236) is **GRANTED**.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE